RECEIVED

MAY 20 2020

AT 8:30 ____________M
WILLIAM T. WALSH
CLERK

USAO2018R00781

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Peter G. Sheridan |
| v. | : | Criminal No. 20- 412 (PGS) |
| PETER J. COSTAS | : | 18 U.S.C. § 1349 |

# INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States Attorney for the District of New Jersey charges:

**(Conspiracy to Commit Health Care Fraud)**

1. Unless otherwise indicated, at all times relevant to this Information:

a. Defendant PETER J. COSTAS ("COSTAS") resided in Red Bank, New Jersey.

b. "Co-conspirator-1" resided in Forest Hill, Maryland. Co-conspirator-1 is not charged in this Information.

c. "Co-conspirator-2" resided in Los Angeles, California. Co-conspirator-2 is not charged in this Information.

d. "Co-conspirator-3" resided in Los Angeles, California. Co-conspirator-3 is not charged in this Information. Co-conspirators 1, 2, and 3 are referred to collectively as the "Co-conspirators."

e. "Patient-1" resided in Fanwood, New Jersey and suffered from heroin addiction.

f. "Patient-2" resided in Red Bank, New Jersey and suffered from heroin addiction. Patient-2 maintained health insurance through "Patient-2's Health Insurance," a private insurer that was a health care benefit program as defined under 18 U.S.C. § 24(b).

g. "Marketing Company-1" was a marketing company incorporated in California. Marketing Company-1 was owned and operated at various times by the Co-conspirators.

h. "Drug Treatment Facilities" or "Facilities" were substance abuse treatment facilities that provided services to assist patients in overcoming their addictions, including detoxification services, partial hospitalization programs, intensive outpatient programs, and outpatient programs.

i. "Facility-1" was a substance abuse treatment facility in Temecula, California.

j. "Facility-2" was a substance abuse treatment facility in Los Angeles, California.

Federal Guidelines for Substance Abuse Treatment

k. The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") was tasked with establishing and implementing a comprehensive program to improve treatment and related

services to individuals concerning substance abuse and protecting the rights of substance abusers. 42 U.S.C. § 290aa.

l. "Substance abuse" was defined generally as the abuse of alcohol or other drugs. "Treatment" meant the "care of a patient suffering from a substance use disorder, a condition which is identified as having been caused by the substance abuse disorder, or both, in order to reduce or eliminate the adverse effects upon the patient," as set forth in 42 C.F.R. § 2.11.

m. Substance abuse treatment facilities provided services to assist patients in overcoming their addictions, including Detoxification Services ("Detox"), Partial Hospitalization Programs ("PHPs"), Intensive Outpatient Programs ("IOPs") and Outpatient Programs ("OPs"). Services and testing at Detox centers, PHPs, IOPs, or OPs could be billed to health care benefit programs when they were medically necessary and provided by, or overseen by, licensed medical professionals.

n. Insurance coverage for substance abuse treatment and testing was available through health plans offered directly by private insurance companies, in addition to government-funded insurance providers. The private health insurance providers were "health care benefit programs," as defined in 18 U.S.C. § 24(b); that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

## The Conspiracy

2. From at least as early as in or about December 2017 through in or about November 2018, in the District of New Jersey and elsewhere, the defendant

**PETER J. COSTAS**

did knowingly and intentionally conspire and agree with others to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, as defined by 18 U.S.C. § 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, a health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

## Object of the Conspiracy

3. It was the object of the conspiracy for COSTAS, the Co-conspirators, and others to unlawfully profit by offering to bribe and bribing individuals addicted to controlled substances to induce them to attend drug rehabilitation at Drug Treatment Facilities, which billed health care benefit programs for medically unnecessary services and paid referral fees to COSTAS and the Co-conspirators for each patient they referred.

Manner and Means of the Conspiracy

4. COSTAS helped to orchestrate a patient recruitment and brokering scheme in and around New Jersey, California, and elsewhere, that involved bribing individuals addicted to narcotics to enter into Drug Treatment Facilities for the purpose of receiving referral fees from those Facilities. The scheme worked as follows.

5. The Co-conspirators owned and operated Marketing Company-1, which maintained contractual relationships with the Drug Treatment Facilities around the country, including Detox Centers, PHPs, IOPs, and OPs.

6. The contracts between Marketing Company-1 and the Drug Treatment Facilities called for the payment of fees from the Drug Treatment Facilities to Marketing Company-1 based on several factors, including: (i) the number of individuals referred by Marketing Company-1 or its recruiters; (ii) the duration of the individuals' stay in the Drug Treatment Facility; (iii) the level of purported treatment received at the Drug Treatment Facility; and (iv) the type of coverage provided by patients' health insurances.

7. Marketing Company-1 engaged a nationwide network of recruiters, including COSTAS, who were instructed by the Co-conspirators to identify individuals who: (i) were covered under a health care benefit program, as defined under 18 U.S.C. § 24(b); and (ii) were addicted to heroin or another drug (collectively, "Patients").

8. The Co-conspirators knew that, to convince Patients to travel to and enroll in the Facilities when they otherwise would not have, Marketing

Company-1's recruiters, including COSTAS, on numerous occasions offered to bribe and did bribe Patients (the "Patient Bribes"), including Patients in New Jersey. The Patient Bribes often were several thousand dollars.

9. Marketing Company-1 and its recruiters, including COSTAS, directed Patients to Facilities with which Marketing Company-1 had contractual relationships. This was so even though some Facilities provided ineffective drug treatment or, in some cases, actually fostered drug use instead of drug treatment.

10. Once the Patients enrolled at a Facility, the scheme required that the Patient remain there for at least 10 days—regardless of the quality of care—because that time period ensured that the Facility generated sufficient billing to the Patient's health care benefit program such that the Facility could profitably pay a referral payment to Marketing Company-1 (the "Referral Payment"). To advance the scheme, COSTAS specifically instructed Patients to stay at the Facilities for at least 10 days.

11. The amount of the Referral Payment from the Facilities to Marketing Company-1 varied depending on several factors including: how long the Patients remained at the Facilities; the level of purported treatment; and the Patients' health insurance coverage. Facilities paid Marketing Company-1 larger Referral Payments the longer the Patient remained at the Facility after 10 days. Typically, the Referral Payment was between approximately $5,000 and $10,000 per Patient.

12. At the direction of the Co-conspirators, Marketing Company-1 in turn paid a percentage of the Referral Payment to the recruiter, including COSTAS. Typically, recruiters like COSTAS received approximately 50% of the Referral Payment.

13. Marketing Company-1, through its recruiters, including COSTAS, often directed Patients to different Facilities month after month to generate multiple Referral Payments without regard to whether the substance abuse treatment was medically necessary or effective. For example, in a conversation over Facebook, Patient-1 told COSTAS that if COSTAS made good on his promise to pay Patient-1 a Patient Bribe, Patient-1 would enroll in additional Facilities to trigger additional Referral Payments and Patient Bribes: "[J]ust get us [sic] grab the dough and put us in another place. . . . Get paid some more feel me. . . . I'll keep this up all year wit[h] you. As long as you do us right." When Patient-1 expressed doubt about whether COSTAS would pay the Patient Bribe, COSTAS responded, "Don't worry. . . . I do this with SO MANY PPL [people]."

14. COSTAS's role in the conspiracy caused a loss to health care benefit programs of over $500,000.

**Representative Example of the Fraudulent Scheme**

15. In or about March 2018, COSTAS and Patient-2 agreed that COSTAS would pay Patient-2 a Patient Bribe if Patient-2 agreed to enroll at a Facility that had a contractual relationship with Marketing Company-1.

16. COSTAS, on behalf of Marketing Company-1, had previously recruited and offered Patient Bribes to Patient-2 to enroll in three different Facilities in the three prior months, from in or about December 2017 through in or about February 2018. Those three Facilities billed health care benefit programs over $50,000 for Patient-2's stays. In each of those instances: COSTAS had promised Patient-2 a Patient Bribe; Marketing Company-1 had billed the Facilities for Referral Payments associated with Patient-2's enrollment; and COSTAS was owed a percentage of the Referral Payment for recruiting Patient-2 to the Facility.

17. Despite trips to Facilities in the three previous months, on or about March 9, 2018, based on the agreement with COSTAS, Patient-2 traveled from New Jersey to a Detox Facility in California ("Facility-1"). Marketing Company-1 bought Patient-2's plane ticket, and Patient-2 remained at Facility-1 for approximately 10 days.

18. Based on billing records, Facility-1 billed Patient-2's Health Insurance approximately $46,055.00 for the 10-day stay. Facility-1 also paid Marketing Company-1 a Referral Payment for Patient-2. Marketing Company-1 owed COSTAS a percentage of the Referral Payment, but, in this instance, Marketing Company-1 did not pay COSTAS.

19. Then, on or about March 19, 2018, Marketing Company-1 and COSTAS sent Patient-2 to another Facility in California ("Facility-2") that provided PHP and IOP services. On the same day, Patient-2 reported to COSTAS that "everyone's high" in Facility-2 and that "it's a flop," meaning that

it was not a legitimate substance abuse treatment facility providing bona fide drug treatment services. COSTAS in turn relayed that information to Co-conspirator-3 in a text message conversation. Co-conspirator-3 responded, "Lol," meaning that Co-conspirator-3 was "laughing out loud" at COSTAS's report that Facility-2 was a sham.

20. Approximately six days later, on or about March 25, 2018, Co-conspirator-1 reported via text message to Co-conspirator-3 and COSTAS that Patient-2 was "smoking meth" at Facility-2, referring to methamphetamine. COSTAS replied, "Yes. [Patient-2]'s freaking out at me. [Patient-2] said out of the 10 ppl. [people] in [Facility-2] only 4 are sober. The rest are smoking meth and dope . . . . [Patient-2] said everyone's high and it's a complete flop and [Patient-2] tried to stay sober around it without 'ratting' as long as he could." COSTAS's text message reflects that Patient-2 was trying to remain at Facility-2 long enough to trigger Referral Payments to Marketing Company-1, which would increase the likelihood that Patient-2 would receive the Patient Bribe that COSTAS had promised.

21. The next day, on or about March 26, 2018, Marketing Company-1 was told that Patient-2's Health Insurance denied authorization for reimbursements for Patient-2's stay at Facility-2. In a text message conversation between Co-Conspirator-1, Co-conspirator-3, and COSTAS, COSTAS lamented that because Patient-2 did not stay the required 10 days at Facility-2, COSTAS would not receive a percentage of the Referral Payment. Co-conspirator-1 responded, "Yep I know. When they [sic] insurance is done

they're done." Co-conspirator-3 then stated, "Ain't nothing you can do when an insurance company says fuck you lol[.] At least we didn't find out in the tenth billable day." Patient-2 left Facility-2 soon after.

22. Based on billing information obtained by law enforcement from Patient-2's Health Insurance, Facility-2 billed Patient-2's Health Insurance approximately $17,850 for Patient-2's stay at Facility-2.

In violation of Title 18, United States Code, Section 1349.

**FORFEITURE ALLEGATION**

1. The allegations contained in Paragraphs 1 through 22 of this Information are incorporated here for the purpose of alleging forfeiture, pursuant to 18 U.S.C. § 982(a)(7).

2. Upon conviction of the offense of conspiracy to commit a Federal health care fraud offense, contrary to 18 U.S.C. § 1347, in violation of 18 U.S.C. § 1349, as alleged in this Information, COSTAS shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, obtained by the defendant that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of such offense, including but not limited to $76,425.00 in United States currency.

Substitute Assets Provision

3. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b).

Craig Carpenito

CRAIG CARPENITO
United States Attorney

**CASE NUMBER:** 20-412 (PGS)

**United States District Court**
**District of New Jersey**

# UNITED STATES OF AMERICA

**v.**

# PETER COSTAS

## INFORMATION FOR
**18 U.S.C. § 1349**

**CRAIG CARPENITO**
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

JASON S. GOULD
*ASSISTANT U.S. ATTORNEY*
*(973) 645-2776*

**USA-48AD 8**
**(Ed. 1/97)**